DR. REINALDO J. CARRERAS y DOÑA EMMA LOU QUIÑONES, por sí y como miembros de la Sociedad de Gananciales constituida entre ambos, demandantes y recurrentes, *v.* EPIFANIO GONZÁLEZ SANTOS y OTROS, demandados y recurridos.

*Número:* R-80-571 *Resuelto:* 28 de diciembre de 1981

*Fernando Barnés Vélez,* abogado de los recurrentes; *Ramón Lloveras Otero* y *Carlos A. Quilichini,* abogados de los recurridos José M. Fidalgo & Asociates y José M. Fidalgo; los recurridos no comparecieron.

El Juez Presidente Señor Trías Monge emitió la opinión del Tribunal.

Este caso plantea otras cuestiones noveles sobre la responsabilidad por defectos de construcción.

Los esposos Carreras ("los dueños") contrataron la firma de José M. Fidalgo y Asociados ("Fidalgo" o "el arquitecto") para la preparación de los planos de su residencia. Fidalgo solicitó de unos especialistas la realización de un estudio del suelo. Los especialistas recomendaron que, de utilizarse relleno en el solar, se compactase a un grado mínimo de 90% y que no se construyese zapata alguna sobre el relleno compactado. Fidalgo diseñó los planos de tal modo que seis de las doce zapatas descansaban sobre el relleno a compactarse.

Los dueños de la obra le otorgaron el contrato de construcción al Ing. Epifanio González Santos ("el contratista") y el de supervisión a Fidalgo, el arquitecto. El contratista subcontrató a Roberto Campos Martín ("el subcontratista") para la labor de colocar y asentar o compactar el terreno.

Se llevaron a cabo estas últimas tareas y comenzó la construcción de la vivienda. El dueño, persona lega en materia de construcción, visitó la obra y, al notar que

estaban construyendo varias de las zapatas sobre el te-
rreno rellenado, les llamó la atención al contratista y al
arquitecto. Estos le expresaron que las conclusiones del
estudio del suelo eran exageradas.

Se completó la obra, se mudaron los dueños y al poco
tiempo, en forma progresiva, empezó a agrietarse severa-
mente la casa. Algunas grietas eran de tal magnitud que
las paredes se rajaban totalmente y podía verse a través
de ellas. Defectos de comparable gravedad se manifes-
taron en los techos y los pisos.

Los dueños acudieron infructuosamente al contratista
para que investigara el origen de los vicios y los corri-
giese. Contrataron entonces una empresa para tal fin, la
cual concluyó en diciembre de 1978 que el origen de los
problemas era la compactación deficiente del terreno, muy
por debajo del 90% requerido, agravado por la colocación
indebida de seis de las zapatas. No se controvirtió esta
prueba.

El 27 de marzo de 1979 los dueños demandaron al
arquitecto, al contratista y al subcontratista. El tribunal
de instancia falló que el subcontratista no les respondía a
los dueños, pero que el contratista y el arquitecto les eran
solidariamente responsables. Luego, en reconsideración,
declaró, sin efectuar nuevas determinaciones de hechos,
que la responsabilidad era mancomunada y que el contra-
tista respondía por el 75% de los daños y el arquitecto por
el 25%. Los propietarios demandantes instaron solicitud de
revisión. Reclaman que no puede exonerarse al subcontra-
tista y que se cometió error igualmente al fallar que el
contratista y el arquitecto no les son responsables soli-
dariamente.

*La responsabilidad del subcontratista.*

La primera cuestión a considerar es si un subcontra-
tista está sujeto a la responsabilidad decenal que impone
el Art. 1483 del Código Civil, 31 L.P.R.A. sec. 4124. El
Art. 1483 guarda absoluto silencio sobre los deberes del

subcontratista, mas la doctrina y la jurisprudencia se han expresado a menudo sobre el tema.

 La cuestión inicial a resolver es si se trata verdaderamente de un *subcontratista*, de una persona o entidad con quien se conviene un contrato de obra, o si se trata de un *suplidor*. En este último caso estamos ante la figura de la compraventa y no cabe la responsabilidad decenal. Tampoco procede en el caso de los obreros a destajo o jornal. En el primer caso cabe, conforme las opiniones más autorizadas, en lo que respecta a la parte que el subcontratista realice. Todos los técnicos vinculados al empresario por un contrato de obra están sujetos a tal responsabilidad parcial al extremo que lo esté el propio contratista. Mazeaud y Mazeaud, *Traité Théorique et Pratique de la Responsabilité Civile*, 6ta ed. (por A. Tunc), París, 1970, T. II, pág. 69; Colin y Capitant, *Curso Elemental de Derecho Civil*, 3ra ed., Madrid, 1955, T. 4, págs. 501–502; J. Cadarso Palau, *La Responsabilidad Decenal de Arquitectos y Constructores*, Madrid, Ed. Montecorvo, 1976, pág. 210 y ss.; J. Herrera Catena, *Responsabilidades en la Construcción*, Granada, 1977, Vol. II, pág. 212. En el caso presente es claro que estamos ante la figura del subcontratista y no de la del suplidor o del obrero.

Establecida la posible responsabilidad decenal parcial del subcontratista, corresponde examinar entonces hacia quién fluye esa obligación. ¿Puede instar el dueño una acción directa contra el subcontratista bajo el Art. 1483 por defectos causados por los actos a su cargo o le está reservado ese derecho exclusivamente al contratista?

Las autoridades están divididas sobre este particular. Un nutrido grupo de comentaristas considera que el dueño no puede instar acción decenal directa contra un subcontratista por no existir vínculo contractual entre ellos, entre otras razones. Cadarso Palau, *op. cit.*, págs. 214–217, 219–232; Mazeaud y Mazeaud, *op. cit.*, pág. 76; Q. M. Scaevola, *Código Civil*, Madrid, Ed. Reus, 1951, T. XXIV, pág. 156.

Otro importante sector sostiene la posición contraria. Estima este grupo que la responsabilidad decenal no es estrictamente contractual en su esencia. La responsabilidad no dimana del contrato de empresa que se otorga, sino de la ley. Es una obligación *ex lege* y no *ex contractu*. J. Herrera Catena, *op. cit.*, pág. 212; Colin y Capitant, *op. cit.*, pág. 502. En Inglaterra, donde se ha legislado no hace mucho sobre el particular, se prefiere esta última posición, considerada como la minoritaria. La *Defective Premises Act 1972*, sec. 1, 42 *Halsbury's Statutes of England*, 3ra ed., Butterworth, Londres, 1973, págs. 1396–1397, deroga la regla del derecho común sobre este extremo, que exigía la existencia de "privity of contract" como condición para acciones de este tipo, y da paso a la demanda directa del dueño contra el subcontratista. Algunos autores permiten esta acción directa, pero tras impartirle carácter subsidiario. Primero habría que accionar contra el contratista culpable. R. López Vilas, *El Subcontrato*, Madrid, Ed. Tecnos, 1973, pág. 134.

 En este caso no es indispensable resolver, previo un análisis más a fondo del asunto, cuál es la doctrina que debe prevalecer en Puerto Rico en ausencia de expresión legislativa. No es indispensable porque es clara la responsabilidad delictual del subcontratista.

La doctrina reconoce generalmente la responsabilidad delictual de los subcontratistas frente al propietario, fuera de la posición que se asuma sobre la procedencia de la acción decenal. G. Liet-Veaux, *Le Droit de la Construction*, 5ta ed., París, Librairies Techniques, pág. 264; Dalloz, *Encyclopédie Juridique*, 2da ed., "Contrat d'Enterprise", par. 341, 352. En el caso presente se dan todos los elementos para el reconocimiento de una acción bajo el Art. 1802. El subcontratista, según la determinación de hechos en instancia, era una persona con cuarenta años de experiencia en su trabajo. Los planos le instruían a rellenar y compactar el terreno a un grado mínimo de 90%. El subcon-

tratista fue crasamente negligente en la realización de sus obligaciones. Se hicieron pruebas en nueve lugares del solar, las que arrojaron los siguientes resultados de compactación: 50%, 57.6%, 63%, 69.8%, 70.8%, 74.5%, 74.5%, 76% y 93.4%. El testimonio pericial no controvertido estableció que, de haberse efectuado las pruebas a raíz de completarse la labor subcontratada, los resultados hubiesen sido de un 4 a un 6 por ciento más bajos. El tribunal de instancia concluyó que los daños se debieron a la compactación indebida del terreno y a la colocación de las zapatas, sin precisar el grado al que una y otra acción contribuyeron a los perjuicios sufridos.

El tribunal exoneró al subcontratista por estimar, a todas luces, que la inexistencia de vínculo contractual con el dueño le libraba de toda responsabilidad civil frente a éste. La conclusión es incorrecta, al menos en lo que atañe a la acción de daños fundada en el Art. 1802 del Código Civil, no prescrita en este caso.

*La solidaridad.*

En *Acevedo Hernández* v. *C.R.U.V.*, 110 D.P.R. 655 (1981), señalamos que la solidaridad normalmente no nace fuera de acuerdo de las partes, excepto cuando la ruina se origina en culpa conjunta o cuando la causa del defecto es indeterminable o cuando hay concurrencia de culpas y éstas se encuentran tan íntimamente ligadas que no es posible separarlas.

■ Los daños en este caso se deben, según se desprende de las determinaciones de hechos, a la culpa conjunta del arquitecto, del contratista y del subcontratista. No hemos hallado en autos prueba alguna que justifique vulnerar la responsabilidad solidaria de estos demandados frente al dueño. Los autos están huérfanos de indicio alguno que permita desentrañar la trabazón de culpas aquí existente. La carga de la prueba recae en tal situación en los legitimados pasivos. Mazeaud y Mazeaud, *op.*

*cit.*, págs. 119–121, 799 y ss. Ante la actual situación de hechos, el arquitecto, el contratista y el subcontratista son solidariamente responsables frente al dueño, sin perjuicio de la acción de regreso que quepa entre ellos.

*Por las consideraciones expuestas, se modificará la sentencia recurrida.*